**UNITED STATES of America,**

v.

**Michael Y. DAVIS, Jr. and James Lewis Blanco.**

No. 01–120–A.

United States District Court, E.D. Virginia, Alexandria Division.

Dec. 14, 2001.

---

Rebeca Bellows, United States Attorney's Office, Alexandria, VA, for plaintiff.

Matthew Alan Wartel, Bynum & Jenkins, P.L.L.C., Alexandria, VA, Edwin C. Brown, Jr., Brown, Brown & Brown, Alexandria, VA, for defendants.

### MEMORANDUM OPINION

ELLIS, District Judge.

At issue in this multi-defendant drug trafficking prosecution are (i) defendants' joint post-trial motion for dismissal, acquittal or a new trial, based on two statements made by the prosecution during closing argument—one an alleged improper appeal for law enforcement and the second an alleged comment on defendant Davis' failure to testify at trial and (ii) defendant Davis' objection to an order of forfeiture against him on the ground that the issue of criminal forfeiture, decided by the Court, should have been submitted to the jury.

### I.

On March 29, 2001, defendants Michael Y. Davis, Jr. and James Lewis Blanco were indicted, together with co-conspirators Steven Marsh and Horace Perry, on a drug trafficking conspiracy charge. Specifically, defendants were charged with conspiring to distribute and to possess with the intent to distribute (i) 50 grams or more of crack cocaine, (ii) 5 kilograms or more of powder cocaine and (iii) 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846 and 841 (Count 1). Also included in the Indictment was an additional drug charge against Marsh, pursuant to 21 U.S.C. § 841(a)(1) (Count 2), and a forfeiture count against all defendants, pursuant to 21 U.S.C. § 853.

Davis and Blanco were arraigned on April 9, 2001, at which time both waived formal reading of the Indictment, entered a plea of not guilty and requested a jury trial.[1] Specifically, Davis, by counsel, "respectfully request[ed] a jury trial" and Blanco, by counsel, similarly "demand[ed] a trial by jury." *See United States v. Davis and Blanco*, Criminal No. 01–120 (E.D.Va.2001) (Arraignment Transcript). Neither defendant specifically requested a jury on the forfeiture count. Indeed, no

---

1. Defendant Perry was arraigned and pled guilty to Count 1 of the Indictment, the drug conspiracy charge, on April 6, 2001. Defendant Marsh, in turn, was arraigned on May 18, 2001 and thereafter pled guilty to Count 1 on June 8, 2001. Count 2, charging Marsh with an additional drug offense, was dismissed on the government's motion.

mention of the forfeiture count was made during either arraignment.

Thereafter, on June 20, 2001, the matter proceeded to trial, which lasted four days and culminated in jury verdicts of guilty against both defendants. The government's evidence consisted chiefly of the testimony of nine convicted co-conspirators, namely Stephen Marsh, Horace Perry, Jason McCree, Jason Custodio, John Rodriguez, Luis Barrientos, Kimeth Gardner, Warren Jenkins and Mack Francis. This testimony painted a vivid and credible picture of an extensive drug trafficking conspiracy in which Davis was a supplier of substantial drug quantities to other co-conspirators and Blanco was a street level drug distributor.

McCree, for example, testified that he met Davis in 1995 through Joseph Melson, a marijuana dealer whom McCree assisted in marijuana distribution in the Washington D.C. Metropolitan area. According to McCree, Davis purchased 70 to 100 pounds of marijuana from Melson every two to three weeks for a three month period. Thus, a conservative estimate of the total amount of marijuana Davis purchased from Melson during the three-month period is 280 pounds. During that period, Melson's supplier was Jason Custodio, a California marijuana dealer. Both McCree and Custodio testified that in August 1996, they, along with Melson, Douglas Mudahy, Kristopher Sherman and Tipsuda Indasorn, attempted to transport more than 300 pounds of marijuana by automobile from California to Washington D.C. During this trip, McCree learned that Davis had paid for 100 pounds of the more than 300 pounds of marijuana being transported and that he had hired Sherman to transport the marijuana on his behalf. The trip ended prematurely when law enforcement agents arrested Sherman in Kansas and seized the marijuana.

McCree further testified that on several occasions, he and Davis traveled together to California to purchase large quantities of marijuana from Custodio. In this regard, the trial record reflects that Davis purchased or ordered at least 420 pounds of marijuana during the time that McCree directly assisted him in his drug trafficking activities. McCree thereafter observed Davis selling various quantities of marijuana to customers, ranging from an ounce to 10 pounds. According to McCree, Davis charged his customers $1,000 per pound of marijuana.

Unlike McCree, who testified solely about Davis' activities, Marsh linked both Davis and Blanco to the instant conspiracy. Specifically, Marsh testified that he began purchasing marijuana and crack cocaine from Davis in late 1995 for personal use. In this regard, Marsh typically obtained an ounce of marijuana from Davis on a daily basis. Then, in 1996, Marsh began selling a portion of the marijuana supplied by Davis to other customers, including Cherrard Odom, Barrientos and Blanco. Marsh's testimony established that Davis typically supplied Marsh with a pound of marijuana once or twice per week on consignment. According to Marsh, after he sold the marijuana to users and other distributors, he paid Davis at the rate of $900 per pound of marijuana supplied. Thus, since the record reflects that Davis distributed at least 1000 pounds of marijuana in the course of the conspiracy, a conservative estimate of Davis' illegal marijuana proceeds in this case is $900,000.

Marsh's testimony further established that in addition to marijuana, Davis also supplied powder cocaine to Marsh, which Marsh, with Davis' knowledge, later converted into crack cocaine and sold to various customers including Blanco, Odom and Barrientos. As he did with marijuana, Davis distributed the powder cocaine to

Marsh on consignment, and once it was sold, Marsh paid Davis for the cocaine at the rate of $16,000 per kilogram. On approximately five occasions, Davis distributed kilogram quantities of cocaine to Marsh via Federal Express from Davis' supplier in California to an address selected by Marsh. Additionally, on two of these five occasions, an additional kilogram of cocaine was included in the Federal Express package. In all, therefore, Davis distributed at least seven kilograms of cocaine to Marsh in the course of the conspiracy. And, given that Marsh paid Davis $16,000 per kilogram, a reasonable estimate of Davis' illegal cocaine proceeds in this case is $112,000.

According to Marsh, Blanco was more than just his customer; he also assisted Marsh in other aspects of his drug trafficking activities. For example, when Marsh had to be away, he often provided Blanco with up to four ounces of crack cocaine for distribution to Marsh's customers, including Odom and Barrientos. Indeed, Blanco, on behalf of Marsh, distributed crack cocaine to Barrientos on at least twenty occasions in quantities ranging from a half ounce to an eighth of a kilogram. Additionally, on one occasion in the summer of 1997, Blanco and Barrientos helped Marsh unload and package approximately 100 pounds of marijuana at the residence shared by Blanco and his girlfriend.

Blanco, as a street-level drug distributor, also had his own customers, including Kimeth Gardner. The trial record reflects that Gardner, a drug user, met Blanco in the winter of 1996. Thereafter, from January to April 1997, Gardner purchased crack cocaine from Blanco for personal use on approximately fifteen occasions. Then, from approximately June to November 1997, Gardner purchased user quantities of crack cocaine from Blanco almost every other night and occasionally even more than once a night. Sometime in late 1998, Marsh began distributing crack cocaine to Blanco, Odom and Barrientos out of Gardner's home. Overall, Gardner purchased crack cocaine from Blanco on at least 100 occasions.

Co-conspirators Jenkins, Perry and Francis also testified at trial as to Davis' pivotal role in the conspiracy. Jenkins, for example, testified that he began purchasing marijuana from Davis in 1995, initially for personal use and later for distribution. At the time of Jenkins' arrest, he was purchasing quarter pound quantities of marijuana from Davis every week or two. In late 1996 or early 1997, Jenkins learned that Davis was also selling substantial quantities of powder cocaine and he thereafter obtained one kilogram of powder cocaine from Davis on consignment. With Davis' knowledge, Jenkins converted this kilogram of powder cocaine into crack cocaine and sold the crack to customers, after which Jenkins paid Davis $21,000 for the kilogram of powder cocaine Davis supplied.

Perry's testimony was essentially similar. He testified that he began purchasing quantities of marijuana from Davis in the fall of 1996. Initially, he purchased $20 bags of marijuana from Davis, but later increased this amount to quarter pound quantities. Additionally, in 1997, Perry obtained four to five ounces of powder cocaine from Davis on three to four occasions for $1,000 per ounce. On three of these occasions, Perry, in Davis' presence, converted this powder cocaine to crack cocaine. In all, Perry, with Davis' knowledge, converted into crack cocaine at least four ounces of the powder cocaine supplied by Davis. Perry also testified that just prior to his arrest in February 2001, Davis arrived at his residence driving a 1999 Cadillac Escalade and stated to Perry that

he had just delivered 20 pounds of marijuana to a customer.

Finally, Francis testified that he began purchasing sizeable quantities of marijuana from Davis in either late 1994 or early 1995, for further distribution. Initially, Francis purchased quarter pound quantities of marijuana, but later increased this amount to one pound quantities on a weekly basis. In all, Francis purchased between 50 and 75 pounds of marijuana from Davis. Sometime in 1996, Francis also began distributing powder cocaine, which he testified he obtained from Davis and another supplier.

Following the government's evidence,[2] defendants moved for a judgment of acquittal, pursuant to Rule 29, Fed.R.Crim. P., which was denied. Davis then presented one witness, Jose A. Figueras, a neighbor and former employer. Blanco, in turn, elected not to present any witnesses or documentary evidence. Then, following closing arguments, but before the Court's final instructions to the jury, Davis moved for a mistrial based on an alleged improper "appeal for law enforcement" made by the prosecution in the course of its closing rebuttal argument.[3] The matter was argued at the bench, after which Davis' motion for a mistrial was denied based on the Court's finding that the prosecution's remarks were neither improper nor prejudicial, as they (i) were not "calculated to incite the passions and prejudices of the jurors," *United States v. Martinez*, 935 F.2d 268 (Table), 1991 WL 89932 (4th Cir. May 31, 1991) and (ii) were invited by defense counsel.

There followed nearly a full day of jury deliberations, at the conclusion of which the jury returned verdicts of guilty against both Davis and Blanco. Specifically, Davis was found guilty of conspiracy to distribute and to possess with the intent to distribute 50 grams or more of crack cocaine, 5 kilograms or more of powder cocaine and 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846 and 841. Blanco, in turn, was found guilty of participating in the same conspiracy, except that the jury held him responsible for 50 grams or more of crack cocaine, 500 grams or more of powder cocaine and 100 kilograms or more of marijuana, also in violation of 21 U.S.C. §§ 846 and 841. Following the publication of the verdicts, the Court thanked the members of the jury for their service and excused them without objection from either defendant. The Court then ordered the preparation of a presentence investigation report, set the sentenc-

---

2. The government also presented witnesses who described pen register evidence showing the extent of communications between and among various co-conspirators.

3. Specifically, the challenged remarks are as follows:

In closing, ladies and gentlemen of the jury, one other thing that prosecutors are allowed to do in closing is to make a plea for law enforcement. Don't you find, you know, the analogy as to buying eggs or these other things that are mentioned— these weren't eggs that were being dealt with in our community. Kimeth Gardner did not blow through $45,000 worth of eggs and throw his life down the tubes. You saw, through Kimeth Gardner, a guy who may have had things going on for a while, but doesn't seem to now. These drugs are real. The impact that they have is real.... Now, in closing, I have never told a jury yet what they should do, and I won't do so here, because it is up to you. You are the judge of the facts. You heard both the defense counsel say things like, "The only reasonable verdict," or "The only thing you can do is this or that." I am not here to tell you that, because it's your decision. It's your community. Do what you think is right. And I ask you to convict both of these defendants for the offense charged.

See *United States v. Davis and Blanco*, Criminal No. 01–120 (E.D.Va.2001) (Trial Transcript).

ing date and adjourned. The subject of forfeiture was not raised by the Court or counsel.

On July 3, 2001, Davis filed a timely motion (i) for judgment of acquittal, pursuant to Rule 29, Fed.R.Crim.P., (ii) to dismiss the case with prejudice or (iii) for a new trial, pursuant to Rule 33, Fed. R.Crim.P. This motion focuses not only on the prosecution's alleged improper appeal for law enforcement made in the course of its rebuttal argument, but also on an allegation that the prosecutor in his rebuttal made a prohibited reference to Davis' failure to testify at trial.[4] On July 6, 2001, Blanco filed a post trial motion adopting the arguments contained in Davis' motion.

Two months later, on September 27, 2001, the government filed a motion for issuance of an order of forfeiture against Davis, specifically requesting an order directing Davis to forfeit the 1999 Cadillac Escalade and $500,000 in illegal drug proceeds allegedly obtained by Davis in the course of the conspiracy, pursuant to 21 U.S.C. § 853. Davis objected to the government's motion, arguing that the issue of criminal forfeiture should have been submitted to the jury following publication of the verdicts.

In the course of the sentencing proceedings, defendants' joint post-trial motion was denied and the government's motion for issuance of an order of forfeiture was granted over Davis' objection. Thus, Davis was ordered to forfeit to the government the 1999 Cadillac Escalade and $500,000 in illegal drug proceeds. *See United States v. Davis,* Criminal No. 01–120–A (E.D.Va. Nov. 13, 2001) (Forfeiture Order). Recorded here are the reasons underlying the post-trial motion and forfeiture determinations.

## II.

Defendants move jointly (i) for a judgment of acquittal, pursuant to Rule 29, Fed.R.Crim.P., (ii) to dismiss the case with prejudice or (iii) for a new trial, pursuant to Rule 33, Fed.R.Crim.P. These requests for alternative relief are based solely on the two challenged statements made by the prosecution in the course of its closing rebuttal argument.

As an initial matter, it must be noted that neither a Rule 29 motion for a judgment of acquittal, nor a motion to dismiss the indictment, is the proper procedural means for requesting relief based on a claim of prosecutorial misconduct of the sort alleged here.[5] Instead, where, as

---

4. Specifically, Davis challenges the following additional statements made by the prosecution in the course of rebuttal:

 What was it Mr. Wartel told you in his opening statement? Mr. Wartel told you in his opening statement that the evidence would show that Michael Davis was not guilty. Do you remember when he said that to you? You are allowed to scrutinize claims that the defense makes the same way you scrutinize claims that the government makes. And there was no evidence that supported Mr. Wartel when he made that claim. What was the evidence supposed to be through the one guy that he called that was his employer, that talked about the per diem. That doesn't begin to explain the amount of cash that [Davis] had. Again,

 many of you have financial experience. Take those tax returns, take those bank statements, take those records of the car sales, and look at the amounts that are there. Those are not consistent with someone who is making a $10 an hour per diem and someone that is making the amount of money that is reflected on those tax returns. There is something else that is there, and you will see it if you look at the evidence. The testimony of his employer doesn't begin to explain that amount of money.

 *See United States v. Davis and Blanco,* Criminal No. 01–120 (E.D.Va.2001) (Trial Transcript).

5. *See United States v. Mitchell,* 1 F.3d 235, 240 (4th Cir.1993) (recognizing that a dismissal of the indictment is not the appropri-

here, the requested relief is based on alleged improper statements made by the prosecution in the course of closing argument, the proper motion is one for a new trial. *See United States v. Mitchell,* 1 F.3d 235, 240 (4th Cir.1993). Yet, "[i]mproper remarks during closing argument do not always mandate retrial." *Id.* Rather, to warrant a new trial, the prosecutor's remarks must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (citations omitted). In this regard, the Fourth Circuit has adopted a two-prong test for determining whether a prosecutor's statements "so infected the trial with unfairness" as to warrant a new trial, namely (i) whether the remarks were in fact improper, and (ii) whether the remarks prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. *See United States v. Adam,* 70 F.3d 776, 780 (4th Cir.1995) (citing *Mitchell,* 1 F.3d at 240).

■■■ As to the first prong of the prosecutorial misconduct test, it is well-settled that improper remarks are those calculated to "incite the passions and prejudices of the jurors." *United States v. Martinez,* 935 F.2d 268 (Table), 1991 WL 89932 (4th Cir. May 31, 1991); *Gall v. Parker,* 231 F.3d 265, 315 (6th Cir.2000). Certain pleas for law enforcement may fall into this category. For example, "[a] prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking." *United States v. Monaghan,* 741 F.2d 1434, 1441 (D.C.Cir. 1984). This is so because such comments tend to distract the jury's attention from the record evidence and might persuade a jury to believe that "they will assist in the solution of some pressing social problem" by convicting a defendant, regardless of the actual guilt or innocence of that defendant. *Id.* at 1441. Another category of improper prosecutorial remarks are comments on a defendant's decision not to testify. Indeed, to protect the integrity of the 5th Amendment right against self-incrimination, prosecutors are prohibited from commenting, either directly or indirectly, on a defendant's failure to testify at trial. *See generally Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). And, the proper inquiry in this context is whether "the language used [was] manifestly intended to be, or was ... of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Anderson,* 481 F.2d 685, 701 (4th Cir.1973), *aff'd,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974).

■■■ As to the second prong of the prosecutorial misconduct test, the Fourth Circuit has identified the following four factors to be considered in determining whether a particular improper remark so prejudicially affected the defendant's substantial rights as to deprive him of a fair trial: (1) the degree to which the prosecutor's improper remark has a tendency to mislead the jury and to prejudice the accused; (2) whether the improper remark was isolated or extensive; (3) the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comment was deliberately placed before the jury to divert attention to extraneous matters. *See Adam,* 70 F.3d at 780. In all cases, the decision to grant a new trial based on claims of prosecutorial misconduct lies within the sound discretion of the trial judge. *See United States v. Ar-*

ate remedy for instances of prosecutorial misconduct); *United States v. Odom,* 736 F.2d 104, 117 (4th Cir.1984) (stating that "[p]atent-

ly the defendant would not be entitled to an acquittal even if there were such prejudicial prosecutorial misconduct...").

*rington,* 757 F.2d 1484, 1486 (4th Cir. 1985); *United States v. Gibson,* 559 F.2d 934 (4th Cir.1977). A trial court's discretion to grant a new trial "should be exercised sparingly, and a new trial should be granted only when the evidence weighs heavily against the verdict." *Arrington,* 757 F.2d at 1486 (citing 3 Wright, Federal Practice and Procedure § 353 (1982)). And importantly, a new trial for prosecutorial misconduct "is a remedy reserved for the most egregious case." *United States v. Cabrera,* 953 F.3d 640 (Table), 1992 WL 6811 (4th Cir. Jan.21, 1992) (citing *United States v. Dudley,* 941 F.2d 260 (4th Cir. 1991)).

These principles, applied here, compel the conclusion that the challenged remarks made by the prosecution in the course of its closing rebuttal argument were neither improper nor prejudicial and thus do not warrant a new trial in this case. The first challenged statement—the prosecutor's alleged appeal for law enforcement—can not, on close scrutiny, be fairly characterized as a remark calculated to "incite the passions and prejudices of the jurors;"[6] nor did it improperly suggest to the jury "that they should convict the defendants not for their participation in these crimes, but merely to make a statement about narcotics crimes in general or to prevent future crimes."[7] Indeed, a review of the entire closing argument reveals that its focus, overwhelmingly, was the abundant trial evidence of guilt. And although the prosecutor noted that a plea for law enforcement was "allowed," he, in fact, never made such a plea. In this respect, therefore, his remarks are analogous to a "checked swing" in baseball; he might be said to have signaled an intent to make such a plea, but checked his swing, never followed through and thus can not be charged with a strike. Moreover, the prosecutor's remarks were well within the bounds of permissible government argument and, to an extent, were invited by defense counsel. Indeed, in his closing argument, counsel for Blanco repeatedly analogized the instant case to one involving the distribution of eggs. Thus, it was wholly reasonable for the prosecution to remind the jury, in rebuttal, that the case

---

6. *Martinez,* 1991 WL 89932; *Gall,* 231 F.3d at 315.

7. *See United States v. Pupo,* 841 F.2d 1235, 1240 (4th Cir.1988) (finding improper the prosecutor's remarks urging the jury to "make that statement so that we can address these types of conspiracies that are taking place in our community"); *United States v. Johnson,* 968 F.2d 768, 770–71 (8th Cir.1992) (finding improper the prosecutor's statement urging jurors in a narcotics case to "stand as a bulwark against ... putting this poison on the streets"); *United States v. Solivan,* 937 F.2d 1146, 1148–55 (6th Cir.1991) (finding improper prosecutor's statement urging jurors "to tell [defendant] and all of the other drug dealers like her ... [t]hat we don't want that stuff in Northern Kentucky ..."); *United States v. Beasley,* 2 F.3d 1551, 1559–60 (11th Cir.1993) (finding improper the prosecutor's repeated references to the "war on drugs" and statement that "this is just another battle in that war. It's a battle to save folks from being enslave[d] by crack cocaine ... that's what this battle's about"). For an example of a statement that would likely have been held improper in the Fourth Circuit, but was found permissible elsewhere, see *United States v. Caballero,* 712 F.2d 126, 131–32 (5th Cir. 1983) (characterizing as a "vigorous, but permissible, plea for law enforcement" a statement made by the prosecution to the jury that "you have the chance today to say something about what kind of county we are going to have here in Texas and what kind of society we are going to live and bring our children up in. You say something very definite about that today. And please, would you say something to these people so the word will go back to Florida, so their friends, would you please say you are not going to tolerate it.... Please have the courage, members of the jury, to do what is right, to find each and every one of them guilty").

involved the distribution of illegal drugs, not eggs. And significantly, at no time in its closing argument did the prosecution indicate to the jury that the case should be decided on anything other than the record evidence.

■■ The second statement challenged by defendants—the prosecutor's alleged reference to Davis' failure to testify—was also not improper. First, and most significantly, the prosecution's statement was not "manifestly intended to be ... of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Anderson*, 481 F.2d at 701. To the contrary, the challenged statement consisted merely of (i) a reminder to the jury of a remark made by defense counsel in the course of his opening statement, (ii) a corresponding challenge to that remark and (iii) a comment on the quality of the evidence actually presented by Davis in the course of the trial. These remarks were permissible argument in the circumstances and none related, either directly or indirectly, to the defendants' failure to testify. Moreover, a comment on the failure of defense counsel, as opposed to the defendant, to counter or explain the evidence, as occurred here, is not typically regarded as an impermissible comment on the defendant's failure to testify. *See United States v. Knowles*, 66 F.3d 1146, 1163 (11th Cir.

1995) (finding no error in statement of prosecutor, "Did you even hear an explanation for that?"). In sum, the challenged remark here falls far short of any infringement of defendants' self-incrimination privilege.[8]

■■ Moreover, even assuming the impropriety of the challenged statements, neither prejudicially affected the defendants' substantial rights so as to deprive them of a fair trial. *See Adam*, 70 F.3d at 780. Indeed, both statements were isolated and short in duration and neither was "deliberately placed before the jury to divert attention to extraneous matters." *See id.* Additionally, it is highly unlikely that either statement misled the jury in any respect, especially given the quantity and quality of incriminating evidence presented by the government against the defendants in the course of the four-day trial. *See id.* Indeed, the evidence presented by the government against the defendants, including the uncontradicted testimony of multiple convicted co-conspirators, was extensive and compelling. Moreover, the Court's final instructions to the jury following closing arguments likely cured any error on the part of the prosecution, as the jury was instructed to decide the case solely on the record evidence and not to consider the defendants' failure to testify in arriving at their verdict.[9] The jury is presumed to

---

8. The soundness of this conclusion is underscored by a comparison of the challenged remark in this case with far more direct comments made by the prosecution in the course of closing argument that have been held permissible by the Fourth Circuit. *See United States v. Anderson*, 481 F.2d 685, 701–02 (4th Cir.1973) (finding permissible the prosecution's question to the jury "[w]hat do the defendants say?"); *United States v. Johnson*, 337 F.2d 180, 203 (4th Cir.1964) (finding permissible the prosecution's statement to the jury that the defendant "has presented no defense in this case. He has presented no evidence to contradict the charges against

him. He has produced no evidence to deny numerous statements made by many, many government witnesses. He has produced no evidence to deny the testimony of numerous witnesses of his various activities...."); *Davis v. United States*, 279 F.2d 127 (4th Cir.1960) (finding permissible the prosecution's truthful statement to the jury that the defendant presented no evidence to contradict the testimony presented by the government).

9. Specifically, the jury was instructed as follows:

Defendants in criminal cases have an absolute right under our Constitution not to

have followed these instructions. *See United States v. Francisco*, 35 F.3d 116, 120 (4th Cir.1994).

Accordingly, as neither of the challenged statements made by the prosecution in the course of its closing rebuttal argument was improper nor prejudicial to the defendants, the extraordinary remedy of a new trial based on prosecutorial misconduct is not warranted in this case. *See, e.g., Cabrera*, 1992 WL 6811 (recognizing that a new trial for prosecutorial misconduct "is a remedy reserved for the most egregious case").

### III.

■ Defendant Davis objects to the forfeiture order issued against him in this case on the ground that the issue of forfeiture should have been decided by the jury, not the Court. While the government acknowledges that forfeiture issues are properly submitted to the jury unless, as here, a defendant fails to request or waives a jury on forfeiture, it contends a judicial determination of forfeiture was proper in the circumstances of this case.

Since December 1, 2000, criminal forfeiture proceedings have been governed by Rule 32.2, Fed.R.Crim.P., which "consolidates a number of procedural rules governing the forfeiture of assets in a criminal case." Rule 32.2, Advisory Committee Notes. One such procedural rule is set forth in 32.2(b)(1), which, in pertinent part, provides as follows:

> As soon as practicable after entering a guilty verdict or accepting a plea of guilty or nolo contendere on any count in an indictment or information with regard to which criminal forfeiture is sought, the court shall determine what property is subject to forfeiture under the applicable statute. If forfeiture of specific property is sought, the court shall determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment against the defendant, the court shall determine the amount of money that the defendant will be ordered to pay.

Rule 32.2(b)(1), Fed.R.Crim.P. Prior to the enactment of Rule 32.2, Rule 31(e), now abrogated, required that absent a waiver, all criminal forfeiture matters be submitted to a jury in the form of a special verdict.[10] Yet now, under the new criminal forfeiture rule—Rule 32.2—the issue of criminal forfeiture need not be submitted to the jury in the form of a special verdict, but rather is properly decided by the Court. *See* Rule 32.2(b)(1). This significant statutory change was prompted by *Libretti v. United States*, 516 U.S. 29, 116 S.Ct. 356, 133 L.Ed.2d 271 (1995), which held that there is no constitutional right to a jury trial in criminal forfeiture proceed-

---

testify. The fact that neither Michael Davis nor James Blanco testified must not be considered or discussed by the jury in any way when deliberating and in arriving at a verdict. No inference of any kind may be drawn from the fact that the defendants decided to exercise their privilege under the Constitution and did not testify. As I have already told you, the law never imposes on a defendant in a criminal case the burden or duty of calling any witnesses, or producing any evidence.

*See United States v. Davis and Blanco*, Criminal No. 01–120 (E.D.Va.2001) (Trial Transcript).

10. Specifically, Rule 31(e), entitled "Criminal Forfeiture," provided that "[i]f the indictment or the information alleges that an interest or property is subject to criminal forfeiture, a special verdict shall be returned as to the extent of the interest or property subject to forfeiture, if any." Rule 31(e), Fed.R.Crim.P. (abrogated by Rule 32.2, effective December 1, 2000).

ings.[11]

Despite the fact that criminal forfeiture matters are no longer required by statute to be submitted to the jury, submission of such matters to the jury is still an available option upon the express request of either party. Thus, Rule 32.2(b)(4) provides that "[u]pon a party's request in a case in which a jury returns a verdict of guilty, the jury shall determine whether the government has established the requisite nexus between the property and the offense committed by the defendant." *See* Rule 32.2(b)(4), Fed.R.Crim.P. This provision "gives the defendant, in all cases where a jury has returned a guilty verdict, the option of asking that the jury be retained to hear additional evidence regarding the forfeitability of the property" at issue. Rule 32.2, Advisory Committee Notes.

Davis contends that the criminal forfeiture issue in this case was required to have been submitted to the jury, pursuant to Rule 32.2(b)(4). Yet, the language of the Rule makes unmistakably clear that to be afforded a jury determination of forfeiture under Rule 32.2(b)(4), a party, following the rendering of the guilty verdict, must specifically request "that the jury be retained to hear additional evidence regarding the forfeitability of the property" at issue. Rule 32.2(b)(4), Committee Advisory Notes. Here, Davis made no such specific request. To the contrary, no mention of forfeiture was made in the course of the

trial, by either the parties or the Court, and Davis remained silent when the jury was dismissed following the guilty verdict.

Davis argues that his general election for a jury trial made in the course of the arraignment hearing was sufficient to trigger the Rule 32.2(b)(4) requirement that the forfeiture issue be submitted to a jury.[12] This argument, too, is unpersuasive, as all criminal cases that proceed to a jury trial are the result of such a general election, made either at arraignment or at some other appropriate time in the course of the proceedings. And, were Davis' argument accepted, all jury cases resulting in convictions would automatically require a jury determination of forfeiture, precisely the result Congress sought to avoid in enacting Rule 32.2(b). Indeed, Rule 32.2(b) reflects Congress' manifest intent that jury determinations of forfeiture should not be automatic and should not occur in every case, but rather should result only from a specific and deliberate election by one or both parties. *See* Rule 32.2(b). In short, Davis' argument, if accepted, flatly contradicts the language and purpose of the new criminal forfeiture Rule.

■ Alternatively, Davis contends that even if his general election for a jury trial at arraignment was insufficient to trigger a jury determination of forfeiture under Rule 32.2(b)(4), he nonetheless requests a

---

**11.** Specifically, the Supreme Court held that (i) criminal forfeiture constitutes an aspect of the sentence imposed in a criminal case and (ii) the defendant has no constitutional right to have the jury determine any part of the forfeiture. *See Libretti*, 516 U.S. at 38–41, 116 S.Ct. 356. The Supreme Court further held that the special verdict requirement of former Rule 31(e), now abrogated, is in the nature of a statutory right that can be modified or repealed at any time. *See id.* at 48–49, 116 S.Ct. 356.

**12.** At arraignment, counsel for Davis stated, in pertinent part, "[o]n behalf of Mr. Davis, I represent to the Court that we received a copy of the indictment, waive formal reading of the indictment, enter a plea of not guilty, and respectfully request a jury trial." No mention was made during arraignment about the forfeiture count. And, contrary to Davis' contentions, he did not request a jury trial "on all issues" at arraignment. *See United States v. Davis and Blanco*, Criminal No. 01–120 (E.D.Va.2001) (Arraignment Transcript)

jury determination of criminal forfeiture now, at this late stage in the proceedings. This argument, like the first, fails as a matter of law. Although there is no case precisely on point, analogous Fourth Circuit precedent interpreting the former criminal forfeiture rule—Rule 31(e)— points persuasively to the sensible conclusion that a party who stands silent while the jury is dismissed following publication of the guilty verdict, as occurred here, waives the right to a jury determination of forfeiture under Rule 32.2(b)(4). Specifically, in *United States v. Ham*, 58 F.3d 78 (4th Cir.1995), a defendant convicted of mail fraud and RICO stood silent as the trial court dismissed the jury, despite the fact that the indictment included a forfeiture count. On appeal, the defendant argued that the district court's failure to submit the forfeiture issue to the jury barred a retrial on the criminal forfeiture count on double jeopardy grounds. The Fourth Circuit held otherwise, stating that "if a defendant has an opportunity to object to the trial court's dismissal of the jury before it decides a discrete portion of the case, but fails to do so, the defendant impliedly consents to the jury's dismissal and cannot raise a double jeopardy defense to further prosecution before a second jury." *Ham*, 58 F.3d at 84. But, unlike *Ham*, where the appropriate remedy for failure to submit the forfeiture issue to the original jury was a retrial of the forfeiture issue by a second jury, no such remedy is available here. Indeed, Rule 32.2(b)(4), the provision Davis relies on, only provides a defendant "the option of asking *that the jury be retained to hear additional evidence* regarding the forfeitability of the property" at issue; it does not allow a new jury to be selected to determine the issue of forfeiture in the event forfeiture issues are not submitted to the original jury. Rule 32.2, Advisory Committee Notes (emphasis added). This only strengthens the

conclusion that Davis, by remaining silent while the jury was excused in this case, waived his right under Rule 32.2(b)(4) to have the forfeiture issue submitted to a jury.

 As alternative arguments, Davis contends that a judicial determination of forfeiture in this instance violates (i) the Ex Post Facto Clause, (ii) the Due Process Clause of the Fifth Amendment and (iii) the constitutional rights recognized in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and its progeny. Taking each of these arguments in turn, the Ex Post Facto argument fails (i) in light of the holding in *Libretti*, 516 U.S. 29, 116 S.Ct. 356, that there is no constitutional right to a jury determination of forfeiture and (ii) because a portion of Davis' conduct giving rise to the criminal forfeiture occurred after December 1, 2000, the date Rule 32.2 went into effect. Next, Davis fails to provide any authority in support of his Due Process argument and independent research likewise reveals none. Finally, Davis' reliance on *Apprendi* and its progeny fails, as the principles enunciated in those cases do not apply in the context of criminal forfeiture proceedings. *See United States v. Cabeza*, 258 F.3d 1256 (11th Cir.2001) (rejecting the application of *Apprendi* to forfeiture proceedings); *United States v. Corrado*, 227 F.3d 543 (6th Cir.2000) (same).

In sum, a judicial determination of forfeiture was proper here because (i) Davis, following publication of the guilty verdict, failed to request that the jury be retained to decide forfeiture, as required by the Rule, and, alternatively, because (ii) he effectively waived his right to a jury determination of forfeiture by remaining silent when the jury was excused.

## IV.

 Nor is there any doubt that the forfeiture order entered here is appropri-

ate. Section 853 allows forfeiture where, as here, the offense of conviction itself provides for forfeiture. *See* 21 U.S.C. §§ 846 and 853.[13] Also required for criminal forfeiture is a forfeiture allegation in the indictment or information. *See* Rule 7(c)(2), Fed.R.Crim.P. Here, the forfeiture count included in the Indictment sought forfeiture of all property:

> constituting, or derived from, any proceeds the defendants obtained, directly or indirectly, as the result of such violations; and any of the defendants' property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such violations; including, but not limited to, $500,000, which represents proceeds the defendants obtained, directly or indirectly, as a result of the conspiracy of which they have been charged.

*United States v. Davis and Blanco*, Criminal No. 01–120–A (E.D.Va. March 29, 2001) (Indictment). Additionally, on May 18, 2001, the government appropriately filed a bill of particulars notifying Davis that it also sought forfeiture of the gold 1999 Cadillac Escalade registered in Virginia in his name. *See United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 665 (4th Cir.1996) (recognizing that a bill of particulars is a proper means of identifying assets subject to forfeiture in the event of conviction).

Under federal forfeiture law, "the court can order a criminal defendant convicted of illegal activity to forfeit to the government proceeds gained and property used in the criminal activity or derived therefrom." *United States v. Morgan*, 224 F.3d 339, 341 (4th Cir.2000). And, it is clear that a criminal forfeiture order may take several forms. For example, the government is entitled to a personal judgment against the defendant for the total amount of illegal proceeds obtained by the defendant as a result of the offense, regardless of whether the defendant is still in possession of such proceeds.[14] Second, to the extent the government can trace any of the illegal proceeds to specific assets, it may seek forfeiture of those assets directly, pursuant to 21 U.S.C. § 853(a)(1). *See United States v. Candelaria–Silva*, 166 F.3d 19, 42 (1st Cir.1999). And finally, "if as a result of some act or omission of the defendant, the government cannot trace

---

**13.** Specifically, § 853 provides, in pertinent part, as follows:

Any person convicted of a violation of [the Controlled Substances Act] punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law—
(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation; [and]
(2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation....
21 U.S.C. § 853(a).

**14.** *See United States v. Morgan*, 224 F.3d 339, 342 (4th Cir.2000) (where a defendant was ordered to forfeit to the government all of the illegal proceeds obtained in the course of a marijuana conspiracy, regardless of the fact that he no longer possessed this total amount); *United States v. Baker*, 227 F.3d 955, 970 (7th Cir.2000) (recognizing that the government can enforce its forfeiture award against a defendant "as a regular *in personam* judgment" and include therein the total amount of illegal proceeds the defendant generated over the years as a result of his conduct, not just the amount he has in his possession at the time of conviction); *United States v. Candelaria–Silva*, 166 F.3d 19, 42 (1st Cir. 1999) (same), *cert. denied*, 529 U.S. 1055, 120 S.Ct. 1559, 146 L.Ed.2d 463 (2000); *United States v. Ginsburg*, 773 F.2d 798, 799 (7th Cir.1985) (same); *see also* Rule 33.2(b)(1), Fed.R.Crim.P. ("If the government seeks a personal money judgment against the defendant, the court shall determine the amount of money that the defendant will be ordered to pay.").

the proceeds to specific assets," it may seek a forfeiture of "any property, cash or merchandise, in satisfaction of the amount of criminal forfeiture to which it is entitled." *Id.* (citing *United States v. Voigt,* 89 F.3d 1050, 1088 (3d Cir.1996)); *see also* 21 U.S.C. § 853(p) (authorizing forfeiture of substitute assets).

■ In any event, to justify the issuance of a forfeiture order, the government must establish by a preponderance of the evidence the requisite nexus between the proceeds or property to be forfeited and the offense of conviction. *See Libretti,* 516 U.S. 29, 116 S.Ct. 356; *United States v. Tanner,* 61 F.3d 231, 234–35 (4th Cir. 1995), *cert. denied,* 516 U.S. 1119, 116 S.Ct. 925, 133 L.Ed.2d 854 (1996).[15] Here, this requirement was fully satisfied, as the record establishes by more than a preponderance of the evidence that Davis (i) obtained at least $500,000 in illegal drug proceeds in the course of the instant conspiracy, (ii) purchased the 1999 Cadillac Escalade with proceeds traceable to the drug conspiracy and (iii) used the Cadillac to commit and facilitate various of his drug trafficking activities. Accordingly, the issuance of an order requiring Davis to forfeit to the government $500,000 and the 1999 Cadillac Escalade is proper under 21 U.S.C. § 853.[16]

Appropriate Orders have issued in this case.

---

**15.** In a case involving the forfeiture of drug proceeds, in particular, there is a rebuttable presumption that a given piece of property is subject to forfeiture if the government establishes by a preponderance of the evidence that the property was acquired by the defendant during the period of the drug violation or within a reasonable time thereafter and there was no likely source for the property other than from the drug violation. *See* 21 U.S.C. § 853(d).

**16.** Although the Cadillac Escalade is properly forfeited as an item "used ... in any manner or part, to commit, or to facilitate the com-

mission of" the offense, it also represents a substitute asset that may, in the alternative, be forfeited to the government to satisfy a portion of the $500,000 judgment against Davis, given that the illegal drug proceeds obtained by Davis in the course of the conspiracy are no longer in his possession. *See* 21 U.S.C. §§ 853(a)(2) and (p).