# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1273

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of North Dakota. |
| Shan Wei Yu, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  March 13, 2007
Filed:  May 2, 2007

_____

Before WOLLMAN, JOHN R. GIBSON, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Shan Wei Yu was convicted by a jury of one count of conspiring to transport illegal aliens in violation of 8 U.S.C. § 1324(a)(1) and one count of conspiring to launder money in violation of 18 U.S.C. § 1956(a)(1). The district court[1] sentenced him to 108 months imprisonment. Yu appeals, arguing that the court erred in denying his suppression motion, that the prosecutor engaged in misconduct, that the court should have held a competency hearing, and that his sentence is unreasonable. We affirm.

_____

[1] The Honorable Ralph R. Erickson, United States District Judge for the District of North Dakota.

I.

Yu owned and operated the Great Texas Employment Agency (Great Texas) along with his girlfriend, Ya Cao. Great Texas was in the business of supplying Chinese restaurants in several states with immigrant workers. Yu advertised Great Texas to Chinese restaurant owners through direct mailings and in the Midwest edition of a Chinese periodical, agreeing to supply "Hispanic and Middle Southern American workers" for "odd jobs" or positions such as "dishwashers" or "busboys." Upon receiving an order from a restaurant owner, Great Texas would recruit immigrant workers from Texas, and arrange for their transportation to the restaurants. The driver would collect a $450 fee upon delivery of the worker, keep $300, and transmit $150 to Great Texas. The restaurant owner would then deduct the $450 from the employee's first pay check. Yu testified at trial that Great Texas placed at least 6,000 workers in restaurants since the agency opened in 1998.

Authorities began investigating Yu after a border patrol agent encountered two men riding bicycles on Interstate 29 in North Dakota in June 2004 . The two men admitted that they were Mexican citizens who were in the country illegally and who had been working at a Chinese restaurant in Grand Forks, North Dakota. One of the men had an employment contract, written in both Chinese and Spanish, which provided that the employee would receive a salary of $1,000 per month. The contract also listed a 312 area code telephone number for an employment agency.

The Bureau of Immigration and Customs Enforcement (ICE) investigated the matter and obtained a search warrant for the Buffet House restaurant, the former employer for the two men, and the apartment where they were staying. Agents found two more illegal Mexican aliens and similar employment contracts for the two men except their contracts listed a 713 phone number for the employment agency. Agents also found a copy of the World Journal, a Chinese language newspaper, which included an advertisement for Great Texas and the same 312 phone number as found

-2-

in the first individual's employment contract. Agents arrested the two restaurant owners, who admitted that they preferred to hire illegal aliens.

Agents served administrative subpoenas to telephone companies and learned that the 713 and 312 numbers were both assigned to Yu's home in McKinney, Texas and that there had been 275 phone calls between these numbers and various Chinese restaurants in the previous eight months, including two with other North Dakota restaurants. At one of these restaurants agents found another employee forwarded by Yu who was in the country illegally.

Based on this information, agents obtained and executed a search warrant at Yu's house in Texas where they found numerous employment contracts similar to those discovered in North Dakota. Some of the contracts uncovered in Texas listed different phone numbers for the employment agency, but the new numbers were also assigned to Yu. Agents also uncovered business journals which recorded transactions between Great Texas and numerous Chinese restaurants for the prior fifteen months. Entries in those journals indicated that restaurants had ordered approximately 1,528 workers from Great Texas in that period and that Great Texas had delivered approximately 1,072 workers. Also discovered were records from bank accounts owned jointly by Yu and his girlfriend, Ya Cao, with a total value of about $150,000, comprised almost entirely of cash deposits. In addition there were copies of direct mailings sent to Chinese restaurant owners and of advertisements placed in the World Journal which listed the 713 area code phone number and Ms. Chen (Lily) as the contact person.

Agents asked to interview Yu, and he consented. After receiving his Miranda warnings, Yu explained that he lived at the residence with Ya Cao (whom he referred to as Lily) and that Ya Cao and a Spanish speaking recruiter would go to street corners to find workers to fill requests. He said that he paid $20 for each worker recruited. Yu admitted that some of the workers were illegal but said that he assumed most were

-3-

legal and that the restaurants would check on the workers' immigration status. He estimated that over the last 30 to 60 days five of the workers placed through Great Texas were in the country illegally. He also explained to the agents how the workers were transported to the restaurants and how each person involved in the operation was paid.

A grand jury indicted Yu on one count of engaging in a conspiracy to transport illegal aliens for private financial gain and commercial advantage and one count of conspiracy to launder money, knowing that the funds involved were proceeds of transporting illegal aliens for financial gain. Many others, including Ya Coa, were charged with similar crimes in connection with Great Texas.

Prior to trial, Yu moved to suppress statements made to the law enforcement agents in Texas, asserting that his statements were not voluntary because he had not comprehended his Miranda warnings. He said that he did not understand his rights because the Miranda warnings were given in English and he was under the influence of prescription medications. The district court concluded that Yu understood English at a sufficient level, pointing to the facts that Yu had written the court letters in English, that Yu had responded to English questions in court, and that Yu had attended an English speaking college and had been in this country for over 20 years. It noted that Yu had taken 50 mg of Ambien, 20 mg of Prozac, and 100 mg of Seriquel at 5:00 a.m., two hours prior to officers performing the search, but concluded that his consent was voluntary based on the testimony of one of the agents that Yu was lucid throughout the conversation, that the residence was orderly, and that Yu had been able to provide detailed information during the interview, including specifics about his business and health condition.

At trial, the government introduced evidence that the two telephone numbers found on the contracts and at least two others attributed to Great Texas had been documented in several previous traffic stops throughout the country and that in each

case illegal aliens had been discovered. There was evidence of nine different police encounters with employees contracted through Great Texas and 23 of the 24 workers involved were in the country illegally. Xin Min Li, one of Yu's former drivers, testified that Yu was in charge of Great Texas but that he mainly corresponded with Ya Coa, whom he knew as Lily. He said that Ya Cao had told him that restaurant owners preferred illegal immigrants and that the workers were found on street corners. He estimated that fewer than 20% of the workers used by Great Texas were in the country legally. Another former driver, An Dong Ceng, testified that most of the workers being transported were in the country illegally, based on his experience that they packed few belongings and could not speak English. There was also evidence that the workers would often be forced to work long hours for low salaries and no overtime pay.

Yu testified through an interpreter. He testified that he was not aware that the agency placed illegal aliens in positions because his poor health (cancer and obsessive compulsive disorder) made it impossible for him to remain active in the business. He estimated that Great Texas had placed at least 6,000 workers since he opened it and admitted that he reviewed and paid for the advertisements placed in the World Journal. Yu attributed some of the success of Great Texas to his policy of ensuring free delivery of as many as two substitutes for any worker who left the restaurant within the first month. He testified that Ya Cao and an interpreter would find workers at the Salvation Army or missions and that he had used more than 200 different drivers to deliver workers to the various restaurants. He also told the jury that he never answered the phones because of his social anxiety disorder and that he had begun Great Texas in the aim of providing opportunities for immigrants. According to his testimony, Yu had no knowledge any of the workers were illegal and took efforts to ensure that his company did not transport illegal aliens.

During closing arguments, Yu's counsel argued to the jury that Great Texas had been taken over by rogue employees and that Ya Cao had been at the center of the

enterprise but that the government had failed to call her as a witness even though "they can get her if they want her." Defense counsel also argued that the government routinely endangers citizens by giving people drugs during investigations and then following the drug carriers. In response to these arguments, the prosecutor pointed out in his rebuttal argument that Yu also had power to subpoena Ya Cao to testify and referred to the other arguments as red herrings. The jury found Yu guilty on both counts charged in the indictment, and the case proceeded to sentencing.

The district court initially calculated a guideline range of 70 to 87 months based on an offense level of 27 and category I criminal history. That offense level included a nine point increase pursuant to USSG § 2L.1.1(b)(2)(C) for the transportation of 100 or more illegal aliens. The government requested an upward departure and that Yu be sentenced to the statutory maximum of 120 months imprisonment because the offense involved "significantly more than 100 aliens." See USSG § 2L1.1, comment. (n.4) (2005). The court concluded that the offense involved at least 1,000 illegal aliens and departed upward to an offense level of 29, which resulted in a guideline range of 87 to 108 months. The court then sentenced Yu to 108 months, noting that it would have sentenced Yu to the statutory maximum but for his poor health.

Yu appeals. He argues that he is entitled to a new trial because the court failed to hold a hearing sua sponte to assess his competency to stand trial and erred in denying his motion to suppress evidence obtained the morning of the search. He argues that a new trial is also warranted because of prosecutorial misconduct during the government's rebuttal closing argument. Yu also alleges that the court erred in sentencing him. He claims that the court miscalculated his guideline range because the upward departure for the number of illegal aliens transported was unsupported by the facts and that his sentence was unreasonable because the court failed to analyze the factors outlined in 18 U.S.C. § 3553(a).

The government responds that Yu's arguments are without merit because there was not a reasonable doubt as to whether Yu was competent to stand trial, Yu's statements made to the agents were voluntary and therefore admissible, and any error in admitting the statements would be harmless in light of the overwhelming evidence of guilt. The government also maintains that Yu's sentence was not unreasonable given that the district court's finding Yu transported substantially more than 100 illegal aliens was not clear error and that the court considered the § 3553(a) factors.

## II.

Yu argues that we should remand for a new trial because he was denied due process of law by the district court's failure to order a competency hearing sua sponte to assess whether he was able to understand the proceedings against him and to assist his trial counsel. He asserts that his complaints about his attorneys, the fact that he at least once refused to meet with one of them, and the court's knowledge of his mental health condition and use of prescription medications put the court on notice that a competency hearing was warranted. The government responds that there was no evidence that Yu lacked the competency to stand trial and that the facts of this case do not necessitate a competency hearing. We review a court's decision not to order a competency hearing de novo. See United States v. Gary, 341 F.3d 829, 835 (8th Cir. 2003).

Trial courts have a constitutional duty to order a competency hearing sua sponte "when there is a reasonable doubt about the defendant's competency to stand trial." Campbell v. Lockhart, 789 F.2d 644, 646 (8th Cir. 1986). To be competent to stand trial a defendant must have, at the time of his trial, "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." Griffin v. Lockhart, 935 F.2d 926, 930 n.1 (8th Cir. 1991) (citation omitted). Competence is presumed "absent some contrary indication" arising from irrational behavior, the defendant's

demeanor, and any prior medical opinions addressing the defendant's competency. United States v. Long Crow, 37 F.3d 1319, 1325 (8th Cir. 1994).

Yu contends that the court should have ordered a competency hearing because he was taking prescription medications for mental health problems and because he had complained to the court about the conduct of his attorneys. No party suggested at trial, however, that Yu was incompetent or unable to understand the proceedings, see Crenshaw v. Wolff, 504 F.2d 377, 379 (8th Cir. 1974), and Yu testified coherently as to the nature of his defense, his lack of knowledge as to whether the workers were illegal, and the events on the morning of the search. See Long Crow, 37 F.3d at 1326. Yu's complaints about his attorneys – that one attorney failed to retrieve his medical records in a timely manner and that the other pressured him to plead guilty – evidence that Yu understood the case against him and was capable of consulting with counsel. The district court observed Yu testify and directly conversed with him at the status conference. It saw no basis for holding a competency hearing, and the fact that Yu was taking medications (Prozac, Seroquel, Ativan, and sleeping pills) did not necessarily require such a hearing. See Lewis v. United States, 542 F.2d 50, 51 (8th Cir. 1976). The district court did not err by not holding a competency hearing.

Yu also maintains that a new trial is warranted because the district court erred in denying his motion to suppress statements he made on the morning officers searched his house. He argues that he did not voluntarily waive his Fifth Amendment rights because the Miranda warnings were given in English instead of in Chinese and because he was under the influence of prescription medications when he agreed to talk to the officers. He asserts that the early time at which the search was performed along with the fact that several armed agents performed the search made his consent involuntary. The government responds that Yu understood the Miranda warnings and that Yu had a full, coherent conversation with them that morning. The government also maintains that any error in admitting the statements is harmless given the overwhelming evidence of Yu's guilt.

We review the legal question of voluntariness de novo and review the factual findings for clear error. United States v. Luker, 395 F.3d 830, 833 (8th Cir. 2005). Voluntariness is determined by "the totality of the circumstances," Blackburn v. Alabama, 361 U.S. 199, 206 (1960), taking into consideration both the "conduct of the officers and the characteristics of the accused." Wilson v. Lawrence County, 260 F.3d 946, 952 (8th Cir. 2001). Statements made to officers are voluntary unless, "in light of the totality of the circumstances," the defendant's power of self determination was critically impaired. United States v. Judan, 472 F.3d 575, 581-82 (8th Cir. 2007).

The district court considered the testimony of the interviewing officer at the suppression hearing who believed that Yu did not appear to be under the influence of medication or drugs at the time of the search. The officer conversed with Yu for two full hours without a misunderstanding based on language, and Yu provided him with detailed information in English regarding the nature of the business and his personal background. The court also noted that Yu had participated in other court proceedings in English and that it had observed Yu's ability to understand English. Moreover, there is no evidence that coercion or inappropriate tactics were used the morning of the search, and Yu does not deny that he received Miranda warnings. We conclude that the court did not err when it found the officer's testimony credible, see United States v. Contreras, 372 F.3d 974, 977 (8th Cir. 2004), and denied the suppression motion. It is therefore unnecessary for us to reach the government's harmless error argument.

Yu also contends that the prosecutor made improper remarks during the rebuttal phase of closing arguments and that he is entitled to a new trial as a result. He believes a mistrial is warranted because during the government's rebuttal argument the prosecutor brought to the jury's attention that Yu had failed to call Ya Coa as a witness and three times referred to his defense as a "red herring." The government responds that the prosecutor was permitted to make the statements because they were a fair response to arguments made during Yu's closing argument.

We will reverse a conviction for prosecutorial misconduct if (1) the prosecutor's remarks were improper and (2) the remarks prejudicially affected the defendant's substantial rights. United States v. Beckman, 222 F.3d 512, 526 (8th Cir. 2000). If we reach the second step, we consider "(1) the cumulative effect of the misconduct, (2) the strength of the properly admitted evidence of the defendant's guilt, and (3) any curative actions taken by the trial court." Id. Yu did not raise these issues below, so we review the claimed errors for plain error. See United States v. Young, 470 U.S. 1, 6-7 (1985).

During Yu's closing argument, his attorney told the jury that Ya Cao was at the center of the criminal enterprise but that she had not been called as a witness even though "they (the government) can get her if they want her." In response, the prosecutor informed the jury that charges were pending against Ya Cao and that there was no evidence that she would testify had the government requested her appearance. The prosecutor also told the jury that both parties had "equal access" to witnesses and that the defendant also had power to request a subpoena for her testimony. It is a "fair response" for a prosecutor to refer to the subpoena power of a defendant where the defendant has first emphasized the government's failure to call a witness. See,e.g., United States v. Ziesman, 409 F.3d 941, 954 (8th Cir. 2005); United States v. Flynn, 196 F.3d 927, 930-31 (8th Cir. 1999). Because Yu first brought to the jury's attention that the government had failed to call Ya Cao as a witness, it was not misconduct for the prosecutor to inform the jury that Yu also had power to subpoena her. See United States v. Lee, 743 F.2d 1240, 1253-54 (8th Cir. 1984).

Yu also argues that he is entitled to a mistrial because the prosecutor used the term "red herring" three times in the rebuttal argument. He characterizes the government's argument as an attack on the character of opposing counsel and argues that such attacks are improper, see United States v. Holmes, 413 F.3d 770, 774-75 (8th Cir. 2005), especially when made during the rebuttal phase of closing argument. See United States v. Cannon, 88 F.3d 1495, 1503 (8th Cir. 1996). We have found use of

the term "red herring" in the government's rebuttal argument to be improper, but only where that phrase was combined with other statements alluding to defense counsel and deceitful trial tactics. See Holmes, 413 F.3d at 774-75. Use of the term red herring is not improper where, as here, the prosecutor only used the term to argue that some of the issues raised by the defense were not central to the ultimate finding of guilt beyond a reasonable doubt. See United States v. Milk, 447 F.3d 593, 604-606 (8th Cir. 2006) (Gruender and Colloton, J.J.., concurring).

Yu raises two issues in regard to his sentence. He first argues that the court erred by ordering an upward departure and by increasing his sentence based on the number of aliens transported because there was no proof supporting the departure for having transported substantially more than 100 illegal aliens. The government responds that ample evidence supports the court's conclusion. The reasonableness of the district court's sentencing departures are generally reviewed for abuse of discretion, and whether the district court based its departures on a permissible factor is reviewed de novo. United States v. Long Turkey, 342 F.3d 856, 859-61 (8th Cir. 2006). Here, however, Yu does not argue that the court could not have departed upward had it correctly found that he transported 1,000 aliens; he argues instead that this factual finding is not supported by the evidence. We review a challenge to the factual conclusions of a sentencing court for clear error. See United States v. Killgo, 397 F.3d 628, 631 (8th Cir. 2005); see also United States v. Haack, 403 F.3d 997, 1004 (8th Cir. 2005) (holding that sentencing court abuses its discretion by committing a "clear error of judgment").

The sentencing guidelines provide that an "upward departure may be warranted" if "the offense involved substantially more than 100 aliens." USSG § 2L1.1, comment. (n.4) (2005). This court has never determined how many aliens constitute "substantially more than 100 aliens" for these purposes. The United States Court of Appeals for the Second Circuit has concluded that 300 aliens is "certainly substantially more than 100," see United States v. Moe, 65 F.3d 245, 251 (2d Cir.

-11-

1995), but the Ninth Circuit has suggested that an offense must involve more than 400 aliens to qualify a defendant for such a departure. United States v. Nagra, 147 F.3d 875, 886 (9th Cir. 1998). We need not settle on an appropriate number in this case, however, because the parties agree that transportation of over 1,000 aliens is "substantially more than 100" and that a departure is warranted if this finding is not clearly erroneous.

Yu challenges the district court's conclusion that "there are at least 1,000 illegal aliens that were transported" as pure speculation, pointing to the fact that no government witness ventured to guess as to an exact number of illegal aliens involved in his scheme. It is undisputed that Yu provided jobs for at least 6,000 workers in Chinese restaurants over the period alleged in the indictment and that 23 of the 24 workers identified in this case were in the United States illegally. Yu cannot avoid application of the guidelines because his illegal scheme involved so many illegal aliens that it is unreasonable for a court to specify an exact number of aliens transported. We conclude that there is ample evidence supporting the district court's conclusion that over 1,000 illegal aliens were transported and that the court did not abuse its discretion by departing upward.

Yu also claims that his sentence was unreasonable because the district court failed to consider the 18 U.S.C. § 3553(a) factors. We review the reasonableness of a sentence for abuse of discretion. United States v. Little Hawk, 449 F.3d 837, 840 (8th Cir. 2006). The district court abuses its discretion by failing to consider a relevant factor that should have received significant weight, giving significant weight to an improper or irrelevant factor, or committing a clear error of judgment. See United States v. Davidson, 437 F.3d 737, 741 (8th Cir. 2006).

Yu does not assert that he is entitled to a downward departure or that his sentence should have been decreased because of any specific § 3553(a) factor; he instead argues that he is entitled to resentencing because the court did not explicitly

mention the factors when it sentenced him.  It is not necessary for the district court to "provide a mechanical recitation of the § 3553(a) factors" so long as it is "clear from the record" that the court considered them. <u>Little Hawk</u>, 449 F.3d at 840.  In this case, the district court discussed the "nature and circumstances of the offense," <u>see</u> § 3553(a)(1), and the "seriousness of the offense," <u>see</u> § 3553(a)(2)(A), when it noted that the crime involved the trading of persons as "commodities" to work for "slave labor."  It also considered the  "kinds of sentences available," § 3553(a)(3), and the applicable "sentencing range," § 3553(a)(4), when it observed that Yu's crime involved ten times the number of victims necessary to receive the top guideline sentence.  Moreover, the court determined that it would not sentence Yu to the statutory maximum sentence based on his personal "characteristics," <u>see</u> § 3553(a)(1), specifically that he was in poor physical and mental health.  Given that the court did not consider any impermissible factors and gave weight to all the relevant factors, we conclude that the district court's decision to sentence Yu to 108 months imprisonment was a reasonable application of the § 3553(a) factors. <u>See</u>  <u>Little Hawk</u>, 449 F.3d at 841.

  Accordingly, we affirm the judgment of the district court.

_____