**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-4418**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RONALD POULIN,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.   Mark S. Davis, District Judge.  (2:09-cr-00049-MSD-FBS-1)

Argued:  October 27, 2011              Decided:  January 18, 2012

Before DAVIS and FLOYD, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Richard Klugh, LAW OFFICE OF RICHARD C. KLUGH, Miami, Florida, for Appellant.   Alan Mark Salsbury, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.  **ON BRIEF:** Neil H. MacBride, United States Attorney, Alexandria, Virginia, Katherine Lee Martin, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Following a trial in the United States District Court for the Eastern District of Virginia, a jury convicted Ronald Poulin of one count of health care fraud, in violation of 18 U.S.C. § 1347; twenty-six counts of making false statements relating to health care matters, in violation of 18 U.S.C. § 1035; and one count of altering records to obstruct an investigation, in violation of 18 U.S.C. § 1519. The district court sentenced Poulin to sixty-three months' imprisonment and ordered forfeiture of $1,326,852.70 in gross proceeds. Poulin appeals the conviction, sentence, and forfeiture order. For the reasons stated below, we affirm.

I.

A.

Poulin, a board-certified internist, owned and operated a solo hematology/oncology practice in which he treated patients for blood diseases and cancers. Treatment and billing in Poulin's practice involved multiple steps relevant to the facts of the present case. First, Poulin, after meeting with a patient, prescribed medications to treat the patient's condition. Nurses administered these drugs, often at subsequent visits. The administering nurse then recorded the drug in the patient's file and noted all services provided to the patient

2

that day on a "charge ticket." Billers collected the charge ticket and inputted this information into a computer system to create a "charge summary." Poulin reviewed the charge summary at the end of each day, and the billers entered his changes into the system. They then used this information to bill the patient's insurance company. Poulin regularly billed two federally funded insurance programs, Medicare and TRICARE, in this manner.

The charges at issue in the present appeal arose out of Poulin's alleged overbilling of these programs. At trial, the government argued that this overbilling took three forms:

1. Poulin billed for greater amounts of chemotherapy drugs than he actually administered to patients. Although the administering nurse accurately recorded the amount provided on the patient's charge ticket, Poulin changed the quantity on the daily charge summary.

2. Poulin split 40,000-unit vials of Procrit, an anemia drug, between patients so that each patient received 20,000 units. But, at Poulin's instruction, nurses and medical assistants recorded on charge tickets that each patient received an entire 40,000-unit vial.

3. Poulin billed office visits in which patients received chemotherapy drugs and injections under billing code 99213, signifying a "Level 3" visit, even though Poulin

3

knew the office visits did not fulfill the necessary requirements for this code.[1] The government specifically argued that a Level 3 visit requires a personal encounter between the patient and physician, but Poulin billed under this code for visits where nurses administered medications without him seeing or examining the patients. Indeed, the government alleged he was not present in the office during many of the visits. In billing for these visits, the practice applied "Modifier 25," indicating that the patient received an additional evaluation or management service in addition to the procedure or service that was the central purpose of the visit. Here, therefore, the modifier indicated a patient received a service in addition to the administration of chemotherapy or an injection.

---

[1] The Physician's Current Procedural Terminology Manual (CPT), which instructs physicians on the proper meaning of billing codes, describes five levels of office or outpatient visits for established patients. These range from Level 1, the least complex, to Level 5, the most complex type of visit. A patient usually presents with only minimal problems at a Level 1 visit, and the physician generally spends only five minutes performing or supervising the services provided. The CPT specifies that a physician need not be present for this type of visit. In contrast, a Level 5 visit typically involves forty minutes of face-to-face interaction between the physician and patient. Level 3 visits usually involve presenting problems of low-to-moderate severity and require that the physician spend fifteen minutes face-to-face time with the patient or family.

The government initiated an investigation after receiving a complaint about Poulin's billing practices. During the course of this investigation, agents served administrative subpoenas on Poulin's practice directing Poulin to produce certain patient records. After receiving information that Poulin was directing employees to make changes to the subpoenaed records, agents responded by executing a search warrant on the practice.

On April 3, 2009, a grand jury returned an indictment charging Poulin with forty-five counts, seventeen of which were dismissed before trial. Trial began on the remaining counts on November 3, 2009. In light of Poulin's challenge to numerous evidentiary rulings, disputes over whether charged errors resulted in prejudice, and Poulin's contention that there is insufficient evidence to support his conviction, we review in some detail the evidence that each party presented at trial.

B.

The government introduced voluminous documentary evidence and witness testimony during the trial. Nine of Poulin's former employees testified during the government's case-in-chief. Nurses Kelly Shipman and Idella Thomas testified that they administered chemotherapy drugs to patients and accurately recorded the amounts they administered in patients' charts and charge sheets. Shipman and Thomas also stated that they

5

performed Procrit injections.  With Procrit, they split vials between patients but recorded on the charge tickets that they dispensed an entire vial to each patient.  Patients who provided their own vials of Procrit, however, received the entire quantity.  According to Shipman, Thomas told her to do this, and Thomas attested that Poulin instructed her to administer and bill Procrit in this manner.  Shipman also reported that the practice had a standing policy to bill office visits in which patients received injections as Level 3 visits.  Thomas likewise stated that, although she raised concerns that the practice was billing office visits for patients who only received chemotherapy as though a physician had seen them, Poulin and Antoinette Johnson,[2] the office manager, dismissed them.  Finally, Shipman testified that, after Poulin received the subpoenas for patient records, he informed the staff that he was performing an audit of patient files.  He directed employees to make changes to files, but Shipman refused to do so because of "legality" concerns.  She subsequently saw Sherry Fann, a receptionist, and Johnson working on these files and shredding documents.

---

[2] During the trial, witnesses variously referred to Ms. Johnson as "Antoinette" and "Annette."  Because Johnson identified herself as "Antoinette" in her testimony, we use this name.

Three medical assistants—Carrie Applin, Courtney Eure, and Sharrah Jackson—testified, largely corroborating Thomas's and Shipman's testimony. Applin, who worked for the practice for four months, recounted that she saw Poulin mark charge tickets to indicate he performed an office visit even though he had not seen the patient—for instance, indicating he saw a patient who received treatment prior to his arrival at the office in the morning. Eure testified that the office had a standing policy that, when Poulin prescribed Procrit, the nurses and assistants should inject 20,000 units but bill for 40,000 units and for a Level 3 office visit. Eure was also present when the government subpoenaed medical records. In response to the subpoena, Poulin asked her and other employees to alter subpoenaed files, but she refused to follow his instructions because she believed the conduct was illegal. Jackson, too, testified that the office had a policy of splitting vials of Procrit and that she refused Poulin's request to alter subpoenaed records.

Billers from Poulin's practice provided testimony regarding his billing practices with respect to Procrit, chemotherapy drugs, and office visits. Cherise Hairston testified that Poulin wrote a note to the billers informing them that "the only acceptable number of units for [Procrit] is 40," meaning 40,000, and he directed her to bill under code 99213 for office visits that occurred while he was on vacation. Hairston also described

7

charge summaries on which Poulin increased the quantity of chemotherapy drugs to be billed. Similarly, Amy Hague-Brown attested that Poulin made changes to drug quantities and office visit codes on charge summaries. Regarding coding of office visits, Hague-Brown recounted that when she began to work for Poulin she billed lab work and chemotherapy visits as Level 1 or 2 visits, but Poulin later instructed her to bill them as Level 3 or 4 visits.

Poulin's practice employed Michelle Foltz as a biller for approximately one month. Foltz testified that, during that time, Poulin regularly increased chemotherapy drug quantities on charge summaries. Similarly, where a charge summary indicated a patient had received 20,000 units of Procrit, he changed it to reflect that the patient had received 40,000 units. Foltz became concerned about Poulin's billing practices after patients called to complain because they paid co-pays for office visits in which they were not seen by a physician. Foltz reviewed patient charts and determined that Poulin was billing for Level 3 visits at times when he did not see patients, including for visits occurring while he was out of the office. When Foltz confronted Poulin, he informed her it was his practice to bill office visits in this manner, and he told her that she should return co-pays to complaining patients but should not correct the claim with the insurer. Foltz was so uncomfortable with

8

this response that she quit the following day and contacted the government to report suspected fraud.

Finally, Sherry Fann, who worked as a receptionist in Poulin's practice, testified pursuant to an immunity agreement with the government. Fann conceded that after records were subpoenaed, she made changes to patient files at Poulin's direction. Poulin and office manager Johnson described the changes as part of a regular audit, but the practice had not undertaken a similar audit during the four-year period Fann was employed there. Further, Fann knew that other employees had refused to participate in the so-called audit, but she agreed to do so because she "needed [her] job." Most notably, she admitted that she copied a nurse's note drafted by Poulin into multiple patients' files, and, following Poulin's instructions, she signed the note illegibly.

In addition to the testimony of Poulin's former employees, one former patient, Rita Rahn, testified for the government. Rahn kept a calendar of all of her medical appointments, and she reported that on days on which Poulin billed for Level 3 office visits, her calendar indicated she received only lab work and did not have contact with a physician.

Three government agents testified. Agent Paul Hastings, of the Department of Defense Criminal Investigative Service, stated that he served administrative subpoenas on Poulin's office on

9

July 9, 2008, requiring Poulin to produce certain Medicare and TRICARE patient records. Hastings further noted that the government expected these records to be produced in their original condition. After receiving information that Poulin was altering the records, Hastings obtained and executed a search warrant to seize the records. FBI Agent Christopher Emsley also participated in the search of Poulin's office, and, through his testimony, the government introduced documents seized during the search. During the investigation, Angela Zoubul, an FBI analyst, compared the patient files seized by the government with Medicare and TRICARE billing data and with Poulin's travel records. In her testimony, Zoubul introduced two charts summarizing instances in which the records indicated Poulin billed for inflated quantities of chemotherapy drugs and for Level 3 office visits that occurred while he was traveling.

Finally, the government presented testimony from Sheila Stewart and Dan Johnson, representatives of Medicare and TRICARE, respectively. Each witness, having reviewed the program's records, introduced summaries of relevant claims Poulin submitted to these programs. Of particular note, these witnesses stated their understanding of the 99213 billing code. After first reading aloud the relevant portions of the CPT, Stewart stated that the use of this code indicated that the

10

patient saw Poulin during the visit.  Johnson also opined that this code required the presence of a physician.

In addition to witness testimony, the government introduced extensive documentary evidence, including patient files, billing records, and travel records.  Most notably, the government presented documents from patient files that had been or were in the process of being changed to correlate with services billed. Original documents that were found during the search of Poulin's private office, for instance, had been replaced by altered documents in patient files.  The jury also viewed Poulin's handwritten notes instructing Sherry Fann to make specified changes to drug quantities in patient charts.  These notes were found on Fann's desk during the search of the practice.

C.

The defense called four witnesses who were employed in Poulin's practice at the time of trial.  Sharon Guglielmini, a registered nurse, told the jury that, although nurse Kelly Shipman initially told her to administer 20,000 units of Procrit and record 40,000 units, Poulin later provided a written order that she should administer 40,000 units to each patient.  She conceded on cross-examination, however, that Poulin gave this order only after the government executed the search warrant on the practice.

Antoinette Johnson, who served as Poulin's office manager, testified regarding the so-called audit of subpoenaed patient files. After taking delivery of the subpoena, Johnson undertook a review of the subpoenaed files. She testified that she found numerous errors, including many instances of underbilling. She asserted that she did not make any changes or add information to patient files, however, and only compiled information on errors in a separate document. When cross-examined, Johnson identified Poulin's handwriting on notes directing that changes be made so that the information in patient files corresponded to services billed.

Lynnette Riner began working for Poulin as a biller in June 2008, shortly before the government served the administrative subpoenas. She testified that, although Poulin occasionally made changes to charge summaries, he only downgraded the levels of office visits—from Level 3 to Level 1, for instance—and he did not change drug quantities. Carol Cross, another biller, began working for Poulin in April 2009. Cross corroborated Johnson's testimony that a review of Poulin's records revealed significant underbilling, but she acknowledged on cross-examination that underbilling on some claims would not justify overbilling on other claims. Significantly, Cross conceded that a Level 3 office visit must include an encounter between the

12

patient and the physician and only a Level 1 visit does not require the presence of a physician.

At the close of evidence, the district court instructed the jury on the relevant law. It declined to give several jury instructions proposed by the defense. The district court also overruled defense objections to statements made during the government's closing arguments. The jury returned guilty verdicts on all counts submitted to it.

D.

Following the jury trial, on January 11, 2010, the district court held a hearing to determine the amount of forfeiture required under 18 U.S.C. § 982(a)(7). At this hearing, Poulin requested, for the first time, a jury determination of forfeiture. The district court rejected this request as untimely and ordered forfeiture of $1,326,852.70, the entire amount received through fraudulent bills. At sentencing, the district court, over a defense objection, applied an enhancement for Poulin's role as a leader or organizer of criminal activity and sentenced Poulin within the resulting Guidelines range to sixty-three months' imprisonment.

Poulin filed a timely appeal, challenging aspects of his conviction, his sentence, and the district court's forfeiture order.

13

Poulin first challenges several of the district court's evidentiary rulings, which we review for abuse of discretion, United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010). We will find the district court abused its discretion if its decision was "guided by erroneous legal principles or rest[ed] upon a clearly erroneous factual finding." Id. (quoting Brown v. Nucor Corp., 576 F.3d 149, 161 (4th Cir. 2009)) (internal quotation marks omitted). If we find an abuse of discretion, the defendant will be entitled to a new trial on this ground unless the error was harmless. Fed. R. Crim. P. 52(a); United States v. Roe, 606 F.3d 180, 185 (4th Cir. 2010). "[T]o find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Johnson, 617 F.3d at 292 (quoting United States v. Brooks, 111 F.3d 365, 371 (4th Cir. 1997)) (internal quotation marks omitted). Where a paucity of evidence otherwise supports the defendant's conviction, erroneously admitted testimony is likely to be important to the jury's verdict. See id. at 296. Conversely, "[o]ften in criminal cases where there is a significant amount of evidence which inculpates a defendant independent of the erroneous testimony, the error is considered harmless." Id. at 295.

14

A.

Poulin argues on appeal that the district court erred in allowing the Medicare and TRICARE representatives, Stewart and Johnson, and former biller Michelle Foltz to testify as lay witnesses regarding the meaning of Medicare billing codes. He specifically objects to their testimony that billing code 99213 (i.e., a Level 3 office visit) requires the presence of a physician. In addition, Poulin contends that the government improperly elicited the testimony of a lay witness, Agent Hastings, regarding the effect of the administrative subpoena on Poulin's right to alter the subpoenaed records.

Under Federal Rule of Evidence 701, a lay witness may provide opinion testimony that is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. An opinion based on "specialized knowledge," in contrast, may be provided by an expert witness only after certain conditions are satisfied. See Fed. R. Evid. 702. We have recognized that, often, this "distinction . . . 'is a fine one' and 'not easy to draw.'" Roe, 606 F.3d at 185 (quoting United States v. Perkins, 470 F.3d 150, 155 (4th Cir. 2006)).

15

It is unnecessary in the present appeal to determine on which side of this fine line the contested testimony falls because, even assuming arguendo it was admitted in error, we can identify no harm that resulted. Poulin asserts that Johnson, Stewart, and Foltz should not have been permitted to opine that a Level 3 office visit requires the presence of a physician. A defense witness, however, provided identical testimony. Carol Cross testified without objection that only a Level 1 office visit does not demand interaction between the patient and the physician, and she agreed that a Level 3 visit requires an encounter between the patient and the physician. Under these circumstances, we find that the jurors' judgment could not have been substantially swayed by the testimony of the government witnesses.

Even absent Cross's testimony, the potential for harm from the witnesses' testimony is minimal because the government introduced into evidence the relevant CPT provisions, and these provisions make clear that Poulin could not properly bill under code 99213 for patients who received only chemotherapy drugs or injections administered by nurses. To bill for a Level 3 office visit, the CPT requires at least two of three components: (a) "An expanded problem focused history"; (b) "An expanded problem focused examination"; or (c) "Medical decision making of low complexity." A visit of this type, the CPT notes, "typically"

16

requires that the physician spend "15 minutes face-to-face time with the patient and/or family." Only the description of a Level 1 office visit indicates that the presence of a physician may not be required. Even allowing the possibility that a Level 3 visit may occur without a doctor's presence, a reasonable juror could not conclude, based on the plain text of these provisions, that an expanded, problem-focused history or examination occurred during visits where nurses merely administered drugs pursuant to instructions Poulin provided as a result of prior office visits.

Moreover, in billing for Level 3 visits, Poulin applied Modifier 25. This modifier, according to the CPT, signifies that "a significant, separately identifiable [evaluation and management] service" was provided on the same day as another billed procedure or service. By using Modifier 25, Poulin thus indicated that a distinct service was being provided beyond the injection or administration of chemotherapy, for which he also billed. No "significant, separately identifiable" service can be found, however, where a patient merely receives prescribed drugs and never meets with or is examined by the physician. The application of these provisions in relation to the facts of this case is clear. Accordingly, we are satisfied that the testimony regarding the meaning of the 99213 code, even if erroneously admitted, did not substantially sway the jurors' judgment.

17

Likewise, we reject Poulin's assertion that Agent Hastings's testimony caused harm because it implied that a physician could not correct errors in patient files after receiving a subpoena. The district court instructed the jury that Poulin could not be convicted for obstructing an investigation if he altered records "to accurately reflect" what had occurred. Further, even if Agent Hastings's statement had the potential to influence the jury in a close case, we may say with fair assurance that this did not occur here because the changes Poulin made or directed to be made to patient records—including falsifying nurses' notes—are inconsistent with the mere correction or clarification of records.

B.

Poulin next contends that witnesses provided improper hearsay testimony when they recounted statements made by his former employees about refusing to alter patient records. Federal Rule of Evidence 801 defines hearsay as a statement that is not made while the declarant is testifying at the current trial or hearing and that is offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). But it excludes any statement "offered against a party" that was made "by the party's agent or servant concerning a matter within the scope of the agency or employment" and was "made during the existence of

18

the relationship." Fed. R. Evid. 801(d)(2)(D). This exclusion applies whenever an employee makes a statement "about a matter within the scope of her employment," even if she is not authorized to speak on the matter. United States v. Portsmouth Paving Corp., 694 F.2d 312, 321 (4th Cir. 1982).

Poulin does not dispute that the nurses and medical assistants who refused to change patient records at his direction were his employees at the time they made the out-of-court statements. Nevertheless, he argues that the exclusion does not apply because an employee does not act within the scope of her employment when she refuses to perform a task assigned by her employer and labels this task illegal. This misconstrues the relevant inquiry. The concern of Rule 801(d)(2)(D) is not whether the employee was carrying out the employer's wishes or whether the employee's statement was authorized. Rather, the court must determine whether the subject matter and circumstances of the out-of-court statement demonstrate that it was about a matter within the scope of the employment. Here, the employment duties of the employees who refused to alter patient files included maintaining the contents of these files, and they made the statements to Poulin and other employees. Accordingly, the statements concerned a matter within the scope of the employment relationship. See United States v. Lauersen, 348 F.3d 329, 340 (2d Cir. 2003) (determining that a nurse's

statement that patient files were destroyed concerned a matter within the scope of her employment relationship because nurses in the defendant's office "were responsible for helping maintain patient files").

C.

Poulin also charges that many of these contested statements were inadmissible on the ground that they stated legal opinions. Generally, a witness may not give "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts." United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006). This rule is grounded in the principle that only testimony that will assist the jury is admissible, and testimony that provides "no information other than the witness's view of how the verdict should read" is unhelpful to jurors. United States v. Offill, No. 10-4490, slip op. at 8 (4th Cir. Dec. 6, 2011) (quoting Weinstein's Federal Evidence § 704.04[2][a] (2d ed. 2003)) (internal quotation marks omitted). To determine whether a witness has stated a legal opinion, a court should consider whether the witness has used terms that have a specialized meaning in the law or has responded to a question that tracks the language of the legal principle at issue. See United States v. Barile, 286 F.3d 749, 760 (4th Cir. 2002).

20

Poulin asserts that the district court abused its discretion by admitting legal-opinion testimony when it permitted Poulin's former employees to testify that they refused to alter patient files because they believed doing so was illegal. Although a statement that conduct is illegal typically represents a legal conclusion, here, the district court instructed the jury that it allowed such testimony only so that the jurors would "understand why [actors] did or said certain things." This testimony, therefore, did not simply tell the jurors what result to reach; instead, it helped them to understand the pertinent facts and was relevant to the issue of whether Poulin had the requisite intent to obstruct an investigation. Furthermore, the district court did not abdicate its responsibility to instruct the jury on the relevant legal standard, and it properly instructed the jurors on the need to find that the defendant intended to impede, obstruct, or influence an investigation to convict.[3]

Finding no reversible error, we reject Poulin's contention that he is entitled to a new trial on the basis of an erroneous evidentiary ruling.

---

[3] As discussed in Part II.A, supra, any error in admitting the testimony of Stewart, Johnson, Foltz, or Agent Hastings was harmless.

Poulin asserts that the prosecutor committed reversible misconduct during closing arguments. He challenges two statements made during the prosecutor's rebuttal to defense counsel's closing argument. First, he argues the prosecutor's statement to the jury that Sherry Fann's "immunity agreement is your guarantee that she's telling the truth" constitutes improper vouching. Second, the prosecutor repeatedly described defense counsel's arguments during its closing as "red herrings," which Poulin contends impugned the integrity of defense counsel.

Whether a statement made in closing arguments has unconstitutionally tainted the outcome of the case is a question of law, which we review de novo.[4] United States v. Collins, 415 F.3d 304, 307 (4th Cir. 2005). Improper remarks during the government's closing arguments violate a defendant's due-process rights so as to warrant reversal only if the remarks "so prejudiced the defendant's substantial rights that the defendant was denied a fair trial." United States v. Wilson, 624 F.3d 640, 656 (4th Cir. 2010). Therefore, to obtain a new trial,

---

[4] The government argues that the statement regarding Sherry Fann's truthfulness should be reviewed for plain error because defense counsel failed to enter a contemporaneous objection. Because we find that the statement did not cause prejudice, it does not constitute reversible error under either standard.

Poulin must demonstrate both that a statement was improper and that it caused prejudice. United States v. Smith, 441 F.3d 254, 264 (4th Cir. 2006). Four factors are relevant to our evaluation of prejudice: "(1) the degree to which the comments could have misled the jury; (2) whether the comments were isolated or extensive; (3) the strength of proof of guilt absent the inappropriate comments; and (4) whether the comments were deliberately made to divert the jury's attention." Collins, 415 F.3d at 309 (quoting United States v. Sanchez, 118 F.3d 192, 198 (4th Cir. 1997)) (internal quotation marks omitted).

As to the first inquiry, the government's statement that Sherry Fann's immunity agreement "guarantee[d]" her truthfulness, at minimum, borders on improper vouching. Certainly, it is permissible for the government to argue that a witness's immunity or cooperation agreement provides a strong incentive for truthfulness. United States v. Sullivan, 455 F.3d 248, 259 (4th Cir. 2006). A prosecutor may not implicitly or explicitly suggest, however, that the government "can monitor and accurately verify the truthfulness of the witness'[s] testimony." Collins, 415 F.3d at 308 (quoting United States v. Bowie, 892 F.2d 1494, 1498 (10th Cir. 1990)) (internal quotation marks omitted). Here, the prosecutor's statement regarding Sherry Fann suggested that the government could perfectly enforce the immunity agreement and police against any and all

23

lies.  At best, treating the immunity agreement as a "guarantee" of truthfulness, rather than an incentive to provide truthful testimony, verges on impropriety.[5]

Nevertheless, we conclude that the remark resulted in no prejudice.  It was an isolated comment, so, in light of the compelling evidence of Poulin's guilt, it is highly unlikely the remark misled the jury.  Further, there is no indication that the prosecutor intended to divert the jury's attention.  It instead appears that the prosecutor was seeking to highlight the incentive for truthfulness created by the immunity agreement, which is permissible.

The government also must tread carefully to avoid improper denigration of defense counsel in using the phrase "red herring" during closing arguments.  As the Eighth Circuit has noted, the use of "red herring" may not be "combined with other statements alluding to defense counsel and deceitful trial tactics." United States v. Shan Wei Yu, 484 F.3d 979, 986 (8th Cir. 2007).

---

[5] The government urges that we should find this statement proper because the statement was made during the trial in United States v. Huff, 389 F. App'x 299 (4th Cir. 2010) (unpublished), and, on appeal, we found the record in that case revealed no improper vouching.  Huff is of limited value, however, not only because it is not binding precedent, but also because our opinion does not expressly address the "guarantee" statement. Instead, it states without elaboration that our review of the prosecutor's statements revealed no impermissible vouching.  Id. at 302.  Accordingly, Huff does not dissuade us from expressing our concerns in this case.

24

But the phrase is not improper if the prosecutor uses it only "to argue that some of the issues raised by the defense were not central to the ultimate finding of guilt." Id. at 986-87. The government here used the term in the latter, permissible sense. The prosecutor did not attack "the institutional role of defense attorneys." United States v. Ollivierre, 378 F.3d 412, 421 (4th Cir. 2004), vacated on other grounds by 543 U.S. 1112 (2005); see also United States v. Vaccaro, 115 F.3d 1211, 1218 (5th Cir. 1997) (finding that a statement that defense lawyers as a class seek to "muddle the issues" and "[t]ry[] to make [them] as fuzzy as possible" was "clearly improper"). Rather, in referring to certain defense arguments as "red herrings," the prosecutor explained why he believed these arguments were peripheral to the central factual questions relevant to Poulin's guilt.

In sum, we hold that Poulin was not deprived of due process by reason of the prosecutor's remarks.

IV.

Poulin also argues that we must reverse because the government failed to disclose evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500. The district court denied Poulin's motion for a new trial based on a Brady violation. We review this denial under an abuse-of-discretion standard. Wilson, 624 F.3d at 660 &

25

n.24. We review the district court's determination regarding whether evidence must be disclosed pursuant to the Jencks Act for clear error. United States v. Roseboro, 87 F.3d 642, 645 (4th Cir. 1996).

### A.

Under the rule articulated in Brady, to comply with due process, the government must "disclose 'evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment.'" United States v. Caro, 597 F.3d 608, 619 (4th Cir. 2010) (omission in original) (quoting Brady, 373 U.S. at 87). To establish a Brady violation, a defendant must show (1) the government failed, intentionally or inadvertently, to disclose evidence in its possession; (2) the evidence is favorable, meaning exculpatory or impeaching; and (3) prejudice ensued because the evidence was material to the defense. Wilson, 624 F.3d at 661. A defendant who "can only speculate" as to the existence or content of undisclosed evidence fails to satisfy this burden. Caro, 597 F.3d at 619.

The government consistently has represented that it complied with its Brady and Jencks Act responsibilities, and the district court, in denying Poulin's motion for judgment of acquittal and for a new trial, noted that there was no evidence that the government withheld such material. We agree. Having

26

reviewed the record, we find that Poulin offers no more than speculation that the government failed to disclose material, exculpatory evidence. The only alleged Brady material that Poulin identifies with specificity is the grand jury testimony of Sharon Guglielmini, but, because Guglielmini testified for the defense, we can identify no prejudice that may have resulted from the government's failure to disclose this material.

B.

The Jencks Act mandates that the government must disclose any statement in its possession made by a government witness that relates to the subject matter of the witness's trial testimony. 18 U.S.C. § 3500(b); see also Fed. R. Crim. P. 26.2(a). A "statement" for purposes of the Jencks Act need not be "the witness'[s] actual words," but "it must in some way have been adopted or approved by the witness." Roseboro, 87 F.3d at 645. A statement relates to the subject matter of trial testimony if it "relate[s] generally to the events and activities" to which the witness testified. United States v. Derrick, 507 F.2d 868, 871 (4th Cir. 1974) (quoting United States v. O'Brien, 444 F.2d 1082, 1086 (7th Cir. 1971)) (internal quotation marks omitted).

We find that the district court did not clearly err in determining that the government complied with its Jencks Act

27

obligations. Poulin insists the government failed to disclose prior statements by Agent Hastings, but he has presented no evidence supporting the existence of such statements, which the government denies. The government acknowledges that it did not disclose the grand jury testimony of FBI Analyst Zoubul to the defense. This testimony constitutes a "statement" under the Act, see § 3500(e)(3), and the district court followed the proper procedure in conducting an in camera review of this testimony before determining that it was not Jencks material because it did not relate to the subject matter of Zoubul's trial testimony, see Roseboro, 87 F.3d at 645-46. Based on an independent review of the grand jury testimony, we conclude that this determination was not clearly erroneous. The district court correctly determined that the grand jury testimony related exclusively to counts of the indictment about which Zoubul did not testify at trial.

We therefore find no merit in Poulin's contention that he is entitled to a new trial based on the government's failure to disclose evidence.


V.

Poulin raises two additional challenges to his conviction, both of which require only brief discussion. First, Poulin argues the district court erred in denying numerous jury

instructions that he proposed. We review the district court's "decision to give or not to give a jury instruction . . . for an abuse of discretion." United States v. Allen, 491 F.3d 178, 186–87 (4th Cir. 2007) (quoting United States v. Moye, 454 F.3d 390, 397–98 (4th Cir. 2006)) (internal quotation marks omitted). Legal questions, including whether the district court properly instructed the jury on the statutory elements of an offense, we review de novo. Id. at 187. We will reverse because of the district court's refusal to provide a requested instruction only if (1) the instruction was correct, (2) it addressed an issue that was not otherwise substantially covered by the court's instructions, and (3) the "failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." United States v. Lewis, 53 F.3d 29, 32 (4th Cir. 1995) (quoting United States v. Camejo, 929 F.2d 610, 614 (11th Cir. 1991)) (internal quotation marks omitted).

Having reviewed the district court's instructions, we find they correctly state the governing law. The district court properly instructed the jury on the meaning of "materiality," which is well-established by precedent. See, e.g., Neder v. United States, 527 U.S. 1, 16 (1999); Kungys v. United States, 485 U.S. 759, 770 (1988). Accordingly, it did not abuse its discretion in rejecting Poulin's proposed instruction on this issue. The district court also provided correct instructions

29

regarding the necessary mens rea to support the charged offenses and the jury's responsibility to determine facts and evaluate credibility. These rendered superfluous the remaining instructions that Poulin sought.

Second, we reject Poulin's challenge to the sufficiency of the evidence supporting his conviction. We review such a challenge de novo. United States v. Kelly, 510 F.3d 433, 440 (4th Cir. 2007). We review the record in the light most favorable to the government in determining whether there is substantial evidence to support the conviction. United States v. Penniegraft, 641 F.3d 566, 571 (4th Cir. 2011). Circumstantial as well as direct evidence is considered, and the government is allowed "the benefit of all reasonable inferences from the facts proven to those sought to be established." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982). The conviction may be reversed only if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Tran Trong Cuong, 18 F.3d 1132, 1140–41 (4th Cir. 1994) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (internal quotation marks omitted). Based on our careful review of the record, we conclude for the reasons stated in the district court's well-reasoned opinion denying Poulin's Rule 29 motion that ample evidence—including both

witness testimony and voluminous documentary evidence—supports Poulin's conviction for each count.

## VI.

Poulin next challenges his sentence on the ground that the district court erred in applying an enhancement for his leadership role in criminal activity under U.S.S.G. § 3B1.1(c). "A district court's findings regarding offense enhancement are factual in nature and are reviewed only for clear error." United States v. Carter, 300 F.3d 415, 426 (4th Cir. 2002).

The Sentencing Guidelines direct a sentencing court to increase a defendant's offense level by two levels if the defendant "was an organizer, leader, manager, or supervisor" of criminal activity involving "one or more other participants." U.S.S.G. § 3B1.1(c) & cmt. n.2. To be a "participant," an individual "need not have been convicted." § 3B1.1 cmt. n.1. Yet the individual must be "criminally responsible" for the conduct, id., not an "innocent bystander[] used in the furtherance of the illegal activity," United States v. Harvey, 532 F.3d 326, 338 (4th Cir. 2008).

The district court rejected Poulin's argument that all other alleged participants in his crimes were not criminally responsible because they lacked the requisite intent. The district court instead concluded that the government established

by a preponderance of the evidence Sherry Fann's criminal responsibility for altering records with intent to obstruct an investigation. The criminal nature of Fann's conduct—which included fabricating nurse's notes and forging signatures—was plain, and Fann participated in the conduct even after others objected that they believed it was illegal. These facts make clear that Fann was not a mere "innocent bystander" swept up in Poulin's criminal activity. Accordingly, the district court's conclusion was not clearly erroneous.

## VII.

Finally, Poulin presses several arguments in challenging the district court's order imposing forfeiture in the amount of $1,326,852.70. Poulin argues he was not afforded an opportunity for jury resolution of the forfeiture claim. He also maintains that under the forfeiture statute applicable to health care offenses, he is entitled to a set-off for the amount he would have received had he billed properly for services actually rendered, so the district court erred in ordering forfeiture of the entire amount he received through fraudulent billing. Poulin finally argues that the government failed to establish the statutory prerequisites for forfeiture of substitute assets. We find each argument to be without merit.

32

In an appeal from criminal forfeiture proceedings, we review the district court's legal conclusions de novo and its findings of fact for clear error. United States v. Martin, 662 F.3d 301, 306 (4th Cir. 2011). We first consider Poulin's argument that he was improperly denied a jury determination of the forfeiture claim. Federal Rule of Criminal Procedure 32.2 governs criminal forfeiture. Under the version of Rule 32.2 in place at the time of Poulin's trial,[6] the jury determines matters regarding forfeiture only upon a party's request.[7] See Fed. R. Crim. P. 32.2(b)(4) (2009). Therefore, a defendant who failed to make such a request before the jurors were excused waived his right to have the jury resolve these matters. United States v. Davis, 177 F. Supp. 2d 470, 483 (E.D. Va. 2001). Poulin did not

---

[6] We note that there is no constitutional right to a jury determination of forfeiture matters. Libretti v. United States, 516 U.S. 29, 49 (1995). The relevant inquiry, then, is whether the district court complied with the applicable procedural rule.

[7] On December 1, 2009—after the completion of the jury trial on November 17, 2009, and before the hearing on forfeiture on January 11, 2010, at which Poulin first expressly requested a jury determination—Rule 32.2 underwent material changes with respect to requests for a jury determination of forfeiture. The post-December 1 Rule places the burden on the district court to determine before the jury begins deliberations whether either party requests a jury determination. See Fed. R. Crim. P. 32.2(b)(5)(A) (2010). A new procedural rule applies to pending procedures only if feasible. 28 U.S.C. § 2074(a). It would not have been feasible for the district court to comply with the later version of Rule 32.2 in this respect because, by the time it became effective, the jury had completed deliberations and had been excused.

request a jury determination of forfeiture at the time of trial. After the jury returned its verdict, defense counsel stated that the court needed to address "the remainder of the indictment." But, immediately after making this statement, defense counsel informed the district court that there was "[n]othing more" that had to be addressed before the court excused the jury. By not requesting a jury determination until a subsequent proceeding, long after the jury was excused, Poulin waived this right.

We also conclude that the district court did not err in ordering forfeiture of the entire amount Poulin received through fraudulent billing without applying a set-off for the amount he would have received had he billed properly for services actually rendered.[8] A court sentencing an individual convicted of a health care offense must order the forfeiture of the "gross

---

[8] Poulin suggests he did not receive fair notice of forfeiture because the government did not disclose its theory of forfeiture or the amount it would seek. The indictment included a forfeiture allegation, however, as required under both the pre- and post-December 1, 2009, versions of Rule 32.2. Fed. R. Crim. P. 32.2(a) (2010); Fed. R. Crim. P. 32.2(a) (2009). The current version of the rule makes clear that the indictment need not specify the amount of forfeiture, while the rule in force prior to December 2009 was silent on this issue. In any event, the indictment provided that the government intended to seek forfeiture of "the gross proceeds" of the alleged health care fraud, amounting to "[a] sum of money of at least $850,000.00." This, we conclude, was a sufficient allegation, notifying the defendant of the government's intent to seek forfeiture.

proceeds traceable to the commission of the offense." 18 U.S.C. § 982(a)(7). In interpreting the continuing criminal enterprise forfeiture provision in United States v. McHan, 101 F.3d 1027 (4th Cir. 1996), we explained that the term "proceeds"—as opposed to "profits"—refers to "the total amount brought in" through the criminal enterprise. Id. at 1041 (quoting Webster's Third New International Dictionary 1807 (1961)). Likewise, in § 982(a)(7), "gross proceeds" is properly interpreted to include the total amount of money brought in through the fraudulent activity, with no costs deducted or set-offs applied. See United States v. Hui Chen, 350 F. App'x 520, 523–24 (2d Cir. 2009) (unpublished) (concluding that because the applicable statute required the forfeiture of "gross proceeds," "there is no merit to defendant's argument that she should be permitted to subtract the market value of the 'services' she provided"). Accordingly, the district court did not err in ordering forfeiture of the total amount Poulin received through fraudulent bills.

Finally, we find no error in the order requiring the forfeiture of substitute property because, as the district court held, see United States v. Poulin, 690 F. Supp. 2d 415, 431 (E.D. Va. 2010), the government established that the defendant comingled legally and illegally obtained funds.

35

## VIII.

For the foregoing reasons, we affirm.

AFFIRMED